A93A0401. POPE v. DEPARTMENT OF HUMAN RESOURCES
et al.
A93A0402. MOORE v. DEPARTMENT OF HUMAN
RESOURCES et al.
A93A0403. MOORE et al. v. DEPARTMENT OF HUMAN
RESOURCES et al.
(434 SE2d 731)

BEASLEY, Presiding Judge.

These appeals present another aspect of the case of two babies who were unknowingly substituted for each other at birth. See *Moore v. Pope*, 196 Ga. App. 475 (396 SE2d 243) (1990) rev'd *Pope v. Moore*, 261 Ga. 253 (403 SE2d 205) (1991), involving baby Cameron's adoption by Mrs. Pope.

On October 7, 1983, Jodie Pope, a white female married to a white male, was admitted to Griffin-Spalding Hospital, where she delivered a white male infant now named Melvin Eugene Moore. That same day, Tina Williams, an unmarried white female, was likewise admitted to Griffin-Spalding Hospital, and she delivered a biracial child, now named Cameron Keith Pope, whose father was Barnes, a black male.

Prior to discharge of the mothers on October 9, someone in the hospital switched the babies, so that Mrs. Pope left the hospital with Ms. Williams' child and Ms. Williams left the hospital with Mrs. Pope's child. On the morning of the discharge, each woman signed a certification that she had examined the baby she was given at discharge and had determined that the child was in fact her baby.

Before entering the hospital, Tina Williams had informed Janice Maddox, a Spalding County Department of Family & Children Services (DFACS) adoption caseworker, that she intended to surrender her child to DFACS for adoption. She told Maddox that Barnes was the father, that the child was thus biracial, and that she had a daughter by Barnes who had blonde hair and looked as if she tanned easily but was in all other respects white in appearance. Maddox viewed a color photograph of the child which showed this to be true.

After Cameron was born but while Ms. Williams was still in the hospital, she contacted Maddox and told her that she had changed her mind. Williams later decided that she wanted to put the baby up for adoption after all. On October 12, she brought Melvin to Maddox and surrendered him for adoption. She told Maddox that Barnes denied he was the father and had asked for a blood test. Williams certified that the baby was hers, signed a sworn affidavit that Barnes was

the father, and surrendered her parental rights.

When Maddox tried to obtain a surrender of parental rights from Barnes, he did not appear for a scheduled interview or respond to telephone calls. As a result, Maddox spoke with an attorney for the Department of Human Resources (DHR) about instituting judicial proceedings to terminate the parental rights of Barnes, as well as "John Doe" respondents. However, on December 6, 1983, Barnes unexpectedly came to the Spalding County DFACS office, executed a sworn acknowledgement of paternity, and surrendered his parental rights. He also answered a questionnaire which showed that he had many African-American relatives who were also light-skinned. He testified that he nonetheless told Maddox at that time that the infant was not the same baby he had seen in the hospital, the baby was smaller and a different color, that he was not the father of this child, and that he had stated this to Williams when she brought Melvin home from the hospital. He also testified that he told Maddox he had asked to take a blood test.

When Maddox delivered Melvin to a foster mother prior to the child's being adopted, the foster mother expressed the opinion that he was fully white. Maddox was concerned with Melvin's fair complexion and purported biracial parentage out of a desire to place him with an appropriate family and to make him aware of what she believed was his biracial heritage. She consulted the district social services director, who sought the advice of a special adoption consultant as to how to resolve ambiguities as to whether a child is biracial. The consultant gave instructions to physically examine the child for dark skin pigmentation, known as Mongolian spots, as an indication that a child is biracial, although the consultant advised that their absence does not establish that the child is not biracial. The consultant also advised them that biracial children sometimes appear to be white in early infancy but experience skin darkening over time. At Maddox's direction, the foster mother examined Melvin for such spots but did not find any.

In January 1984, Melvin, still in foster care, underwent surgery at the Griffin-Spalding Hospital. So that the child would be provided with informed medical care thereafter, Maddox obtained parts of the medical records relating to his surgery and incorporated them into his adoption record pursuant to standard adoption procedure. Coincidentally, Cameron was also admitted to the Griffin-Spalding Hospital that same month. No one noticed any discrepancy between the blood types of the children as shown in their neonatal records and their blood types as shown in medical records relating to their treatment in 1984.

Through the State Adoption Exchange, DFACS adoption caseworker Lovett placed Melvin for adoption in April 1984 with the

Moores, a biracial couple. (Each was not biracial; one was black and one was white.) In October 1984, their petition to adopt him was granted.

In March 1988, Jodie Pope's husband left her, denying paternity of Cameron. As part of a subsequent divorce proceeding, they all submitted to blood tests which showed that neither he nor Jodie is Cameron's biological parent. However, Jodie adopted him. See *Pope v. Moore*, supra. The boys were now four-and-one-half years old.

The Popes conducted a review of birth records at the Griffin-Spalding Hospital for October 1983 and discovered Tina Williams' records. They also obtained a court order for access to Melvin's adoption records and, as a result, located the Moores. Melvin subsequently went to visit his birth mother Jodie Pope for Thanksgiving, and she refused to return him. Custody is currently in dispute in another case.[1]

The children, Cameron (adopted by Jodie Pope) and Melvin (adopted by the Moores), by next friend and mother Jodie Pope, filed identical actions against the Georgia DHR, the Georgia DFACS, the Division of Social Services, the Georgia Adoption Exchange, the Spalding County DFACS, the Chatham County DFACS, and various officials and employees, seeking damages for general negligence and professional malpractice because of defendants' failure to recognize that they placed the wrong child for adoption. Plaintiffs state that there are basically two groups of defendants: (1) those directly involved in the wrongful placement of Melvin with the Moores; and (2) those who failed to implement specific training procedures and policies, such as having a child whose biracial parentage is in doubt examined by a trained physician, which plaintiffs allege would have averted the wrongful placement or corrected it after it had occurred.

Defendants moved for summary judgment, arguing among other things that the undisputed material facts showed no negligence on their part. They submitted affidavits and depositions in which experts who are familiar with the standard of care required of workers in the fields of adoption and child placement, and who had reviewed the adoption record of Melvin Moore, testified: The DHR has set proper policies, procedures, and guidelines concerning the placement and adoption of biracial children; reasonable efforts should be undertaken to ascertain the paternity of a child surrendered for adoption; Maddox's actions in this regard met or exceeded professional standards; in cases involving unwed mothers surrendering children for adoption, putative fathers are infrequently named by the mother, and if they

---

[1] The issue of whether the surrender of parental rights signed by Barnes and Williams *legally* related to their biological child Cameron or to the child they physically surrendered, that being Melvin, is not before us.

are named, they rarely acknowledge paternity; where the putative father denies paternity, the appropriate course of action is to obtain a termination of the parental rights of the putative father and "John Doe" respondents through the judicial process; it is not the usual or customary practice to perform blood testing when parental rights are being terminated, and adoption caseworkers lack the authority to compel parties to submit to blood testing; there is no requirement that an adoption caseworker obtain complete medical records for an adoptive child and compare findings for inconsistencies; Maddox obtained all required medical records for placement in Melvin's file.

As their expert evidence, plaintiffs submitted affidavit and deposition of attorney Hayes, who had only reviewed small portions of the adoption record, and the only opinion she expressed was that an issue as to Melvin's parentage and racial background had been raised and needed to be thoroughly investigated, but she did not know if it was in fact thoroughly investigated. When asked whether she was aware of any standards, guidelines, or procedures in the fields of adoption or child placement that are applicable to the facts of this case, she responded that she could say that they exist, but she had not researched them and could not say what they are.

Finding that attorney Hayes is not an expert in the field of adoption or child placement and that her affidavit is insufficient under OCGA § 9-11-56, the court granted defendants' motion for summary judgment on this claim. The court noted that plaintiffs' counsel had conceded at the hearing that there was no support for the professional negligence claim.

Likewise, the court granted defendants' motion for summary judgment on the general negligence claim, on grounds that Maddox and Lovett complied with the applicable standard of care, and that plaintiffs had submitted no evidence of negligence. The court also ruled that defendants were under no legal or professional duty to foresee the bizarre and extraordinary series of events which preceded the adoption of Melvin, and that they owed no duty to Cameron whom they never saw and who suffered no injury attributable to them.

In Case No. A93A0401, Cameron, by Jodie, appeals. In Case No. A93A0402, Melvin, by Jodie, appeals. In Case No. A93A0403, Eugene and Edith Moore appeal, as intervenors on Melvin's behalf as his legal parents, OCGA § 9-11-24.[2]

1. Defendants were entitled to summary judgment on plaintiffs'

---

[2] Their intervention obviates the problem of Mrs. Pope's legal standing to bring suit for Melvin who, although he is in fact her biological child, has been adopted by the Moores. Their intervention on Melvin's behalf creates the anomaly of their pressing a claim that he was injured by being placed for adoption by them.

professional negligence claim.

The court was authorized to rule that attorney Hayes is not an expert in the fields of adoption and child placement, see *Strickland v. DeKalb Hosp. Auth.*, 197 Ga. App. 63, 66 (2b) (397 SE2d 576) (1990), and that the contents of her affidavit are insufficient. See *Chandler Exterm. v. Morris*, 262 Ga. 257, 259 (416 SE2d 277) (1992). Plaintiffs do not enumerate these rulings as error; nor do they dispute the fact that their attorney conceded below that there was no support for their professional negligence claim. See *Turner v. Kitchings*, 199 Ga. App. 860 (406 SE2d 280) (1991).

2. Defendants were also entitled to summary judgment on plaintiffs' general negligence claim. Their arguments relate only to Melvin.

When a professional is charged with general negligence, "so-called 'administrative acts' whose performance requires no professional knowledge, skill or experience need not be supported by expert opinion. [Cits.]" *Hillhaven Rehab. &c. Center v. Patterson*, 195 Ga. App. 70, 71-72 (2) (392 SE2d 557) (1990). Expert testimony is also not required in extreme cases where the error of judgment is gross, and negligence is clear and palpable. *Hyles v. Cockrill*, 169 Ga. App. 132, 138 (10) (312 SE2d 124) (1983).

Plaintiffs argue that adoption caseworker Maddox failed to compare Melvin's neonatal medical records with the medical records related to his surgery in 1984 and ascertain that these two sets of records showed different blood types for the child. However, defendants' expert evidence shows without conflict that Maddox obtained all the surgical records which her legal duties required, and the portions of the record to which we have been referred by defendants show that the records Maddox obtained did not reflect the child's blood type. Plaintiffs argue otherwise, but without reference to any place in the record to support the argument with evidence. We thus hold that, as a matter of law on the record in this case, Maddox did not commit any administrative error and is not chargeable with any negligence in this regard.

Plaintiffs argue that Maddox should have administered a blood test to Barnes, Cameron's father. However, defendants' expert evidence again shows without conflict that she was under no legal duty to do this, and it is a matter requiring the exercise of professional judgment.

Plaintiffs have produced no evidence of general negligence and thus cannot avoid adverse summary judgment on this claim. See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

3. Even assuming a breach of duty, it appears from the record in this case that the proximate cause of Melvin's separation from the Popes was the negligence of whoever in the hospital switched him with Cameron at birth. The two mothers' failure to challenge identity

also may have contributed. Melvin's separation from his biological mother Jodie was not caused by Williams' surrendering him for adoption or by state adoption workers placing him with the Moores, as opposed to a white couple had it been determined that he was not biracial. " 'The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. . . .' [Cits.]" *Standard Oil Co. v. Harris*, 120 Ga. App. 768, 771 (3) (172 SE2d 344) (1969).

Plaintiffs charge defendants with negligence in failing to ascertain that Barnes was not Melvin's father. They maintain that they have established causation in fact for damages sought, on the theory that had defendants determined that Barnes was not the father, this would have led Williams to realize that she was not the mother and would have resulted in the return of Melvin to the Popes. That is highly speculative.

A tort defendant is only liable for the reasonably foreseeable consequences of his or her negligent acts. *Hosp. Auth. of Walker, Dade & Catoosa Counties v. Smith*, 142 Ga. App. 284, 287 (5) (235 SE2d 562) (1977). The reasonably foreseeable consequence of an adoption caseworker's failure to ascertain the true paternity of an adoptive child is loss of the biological father's right and the child's corresponding right to establish a parent-child relationship. It was not reasonably foreseeable by defendants that if they determined that Barnes was not Melvin's father, this would have led Williams to determine that she was not the mother and would have resulted in the return of the adoptive child, Melvin, to his biological parents and the surrender for adoption of another child, Cameron. By failing to determine that Barnes was not Melvin's father, defendants could not have breached a duty of care owed to Cameron, a child whom they had never heard of or seen. Whether he was "injured" by adoption by Mrs. Pope rather than by the Moores may not be discernable by legal standards nor measurable by legal yardsticks. In any event, he was in no way injured by the defendants — nor was Melvin.

4. It is unnecessary to address the remaining arguments regarding liability of the individual defendants.

*Judgments affirmed. Cooper, J., concurs. McMurray, P. J., concurs in the judgment only.*

DECIDED JULY 6, 1993 —
RECONSIDERATION DENIED JULY 30, 1993 — ■

*Robert H. Benfield, Jr., Thomas W. Malone,* for Pope.
*Newton & Howell, John T. Newton, Jr.,* for Moore.
*Michael J. Bowers, Attorney General, Mary F. Russell, Assistant Attorney General, Remar & Graettinger, Robert B. Remar,* for Dept.

of Human Resources.